HAKE v. COACH.[1]

1. PARTNERSHIP ACCOUNTING—INTEREST.

One member of a firm who executes a note shortly after the partners have reached an adjustment of their accounts by which they become equal partners, which note is executed for the firm's benefit, and indorsed by the other partner, is entitled in a subsequent accounting to credit for interest thereon paid by him, although before the adjustment the maker of such note was to furnish the necessary money to conduct the partnership business.

2. SAME—LUMBERING OPERATIONS—SHORTAGE—EVIDENCE.

Upon a review of the evidence in a suit for a partnership accounting, held, that complainant had failed to establish his claim that there was a shortage in defendant's accounts with respect to the logs handled by him as the managing partner in the lumbering operations of the firm.

3. SAME—UNITEMIZED BILLS—METHOD OF STATING ACCOUNT.

In stating a partnership account, it was proper to exclude credits claimed by one of the partners for alleged payments for labor and supplies in connection with lumbering operations of the firm which were under his management, where, owing to the fact that the bills were not itemized, there was no means of determining to what extent such payments were legitimate, and it was apparent that portions thereof were embraced within the itemized accounts.

4. SAME—PERSONAL EXPENSES.

A claim by one partner for personal expenses was properly disallowed; it appearing that he had made no attempt to keep an account of his expenses, and that he was engaged in business on his own account during the continuance of the partnership.

Appeal from Kent; Grove, J. Submitted April 28, 1897. Decided October 25, 1897.

Bill by William Hake against William Coach for a partnership accounting. From the decree rendered, defendant appeals. Modified and affirmed.

[1] Rehearing (application of defendant) denied January 25, 1898.

*D. E. Corbitt* (*Butterfield & Keeney*, of counsel), for
complainant.

*Chadbourne & Rees*, for defendant.

MONTGOMERY, J.    This is a controversy between part-
ners.   Some features of the case were settled by the
opinion of this court reported in 105 Mich. 425, to which
reference is made for a general statement of the case.
On the present appeal the questions are presented by
exceptions to the findings of the commissioner on an
accounting, and relate to 12 several items of the account.
To discuss in detail each of these several items, and to
give at length the reasons for our conclusions, would
extend this opinion unreasonably, and would not result in
benefit to the profession.   We will therefore content our-
selves with a brief reference to the more important items.

1. Complainant was allowed a credit of $1,355.33 for
interest on a note given by him, and subsequently in-
dorsed by defendant, the proceeds being used in the pur-
chase of additional land.   No question is made over the
payment of this interest by complainant, but it is insisted
that the note is to be treated as complainant's contribu-
tion to the capital stock, and that there was an agreement
that complainant should furnish the necessary money to
conduct the business.   Shortly before the note was given,
the parties had reached an adjustment of their accounts,
by which they became equal partners.   The course of
deal was such as to indicate that both parties regarded
this paper as firm paper.   Notes subsequently given in a
similar transaction were so treated by defendant.   No
good reason is shown why defendant indorsed the paper
in question, except that he understood that it was exe-
cuted for the firm's benefit.   We are satisfied that after
the equalization it was not intended that complainant
should use his credit and meet the interest charges on
obligations incurred for the firm's benefit.   This excep-
tion will be overruled.

2. The defendant was charged in the account with

shortage in logs not accounted for, $24,687.55. The commissioner, after reviewing the testimony as to this item, and giving his reason for so finding, found the defendant not chargeable on account of any shortage in logs. The circuit judge reached the opposite conclusion, and allowed the sum stated. Both because of this difference in result and because of the great importance of the question, we have given a most careful examination of the briefs of counsel and the testimony in the record relating to this item; and, after such examination, we feel constrained to hold that the record does not support the conclusion of the learned circuit judge. The defendant's testimony tends to show that the logs that were cut, except so far as they were lost in transit or consumed by fire or sold in the log, were taken to the mills, and sawed into lumber, and the lumber sold and accounted for. This testimony is supported by the testimony of the mill owners who did the sawing. The complainant offers testimony of what the wood scale was, showing a discrepancy of nearly 3,000,-000 feet, which, it is contended, has not been properly accounted for. To make up this discrepancy, complainant starts out by making a charge of 1,500,000 feet on hand at the time of the equalization. Complainant, in his own testimony, states that at the time of the equalization the profits amounted to $48,000, and in answer to the question, "Did he tell you of what it consisted?" replied, "$27,000 due from Gregory, $16,000 worth of logs in the boom, $4,000 money in bank, $1,200 in complainant's hands, $7,000 camp equipments." Charles Hake, complainant's son, and a witness in his behalf, gave the same figures. It will be seen that these figures, given in detail, amount to $55,200, instead of $48,000. Charles Hake had been on the stand at an earlier date, and had testified as follows:

"*Q.* What statement was made in regard to the amount of money that was invested, and the property that they had on hand at that time?

"*A.* At that time?

"*Q.* Yes; by Mr. Coach.

"*A.* Mr. Coach made a statement,—an offhand statement. He stated the amount that was coming to us for lumber sold, and the value of the camp equipments, horses, etc., the value on those, and what logs we had left, etc.

"*Q.* What did he estimate them worth?

"*A.* He said we had $40,000 in, and at that time wasn't owing anything; had $40,000, and still held our lands in Wisconsin, and some timber there on the Sturgeon.

"*Q.* In addition to the $40,000 invested?

"*A.* Yes; in addition to the lands, some little lands we had left on the Sturgeon."

And on cross-examination testified:

"*Q.* Now, you said that Mr. Coach stated that there was $48,000 to divide; is that it?

"*A.* I stated $45,000.

"*Q.* What was meant by that $45,000?

"*A.* The property, equipage, and the money that was coming to the firm from parties up there.

"*Q.* Was it intended to mean net profits?

"*A.* That was what we had on the Upper Peninsula, all told.

"*Q.* It included investment and profit and everything else, did it not?

"*A.* Outside of the Wisconsin lands.

"*Q.* Outside of the Wisconsin lands?

"*A.* Yes, sir.     *     *     *

"*Q.* And the logs were merely estimated, were they not?

"*A.* An estimate according to the scale. He had a scale, but he said he could not tell just exactly how many were at the mill.

"*Q.* Do you remember the figures that he gave?

"*A.* Of the number of feet?

"*Q.* No; the amount.

"*A.* The amount? The sum total, $45,000.

"*Q.* Of what did it consist, and give specific amounts.

"*A.* I could not do that now. I did not keep any track of that.

"*Q.* Do you know how much consisted of uncut pine, or pine lands?

"*A.* No, sir; I don't. I know we didn't have but very little of that left at the time.

"*Q.* Do you know how much consisted of logs?

"*A.* No; I could not tell.    He could not tell exactly, only from the number of logs that he claimed were cut

"*Q.* I mean how much was agreed on at that time, or estimated at that time, as being in logs?

"*A.* That I could not say."

Henry Hake testified that there were about 1,500,000 feet, and further testified:

"*Q.* Do you remember whether it was just a million and a half, or a little more or less?

"*A.* I think that was about what was left there.    There was a few of them burned.    There was more than that in the first place."

The exact scale of these logs was not given by Henry, and we are satisfied that, when his testimony was given, it was a matter of recollection with him; and not only is this so, but there is a wide discrepancy between the figures which are given by the complainant and his witnesses as to the total assets of the firm at the time of the equalization, and the figures as made up of the items, if the logs are figured at 1,500,000.    The inference is not an unfair one that the parties were mistaken in estimating that there were $16,000 worth of logs on hand.    The testimony on behalf of defendant, by himself and foreman, shows that there was no such quantity of logs on hand at the time.    It is true that there is still a discrepancy between the wood scale and the account of lumber manufactured, presented by defendant.    The wood scale shows the merchantable lumber in the logs.    It was made by Henry Hake, who had had little experience, and there is room to question his ability in estimating defects; but, if it be assumed that his scale is accurate, a large part of this discrepancy is accounted for by the fact that large quantities of these logs were hung up in the river, a portion for one season, and a portion for two, and that, as a result, a large quantity of the timber in the logs became sap-stained, and would cut to mill culls, not merchantable. The circuit judge finds that there should be deducted on this account, on the wood scale, 760,000 feet.    We are

satisfied that these figures are too small, and that the deduction from this cause should be somewhat greater than found by the circuit judge.

We do not overlook the contention, so strenuously insisted on by complainant's counsel, that, as the shipments included mill culls, these culls are not to be deducted from the wood scale; but while it is true that some of the culls were apparently sawed into lumber, and sold, it appears that the shortage in mill culls is explained by the fact that they were not marketable, and that a large quantity was turned over to the millmen to pay the saw bill on the mill culls themselves, and there is testimony that some of the mill culls went to the burner as worthless. Nor do we overlook the contention of complainant that the general experience among lumbermen is that the cut at the mill will overrun the wood scale, and, if the accuracy of the scale in this case were beyond question, we should be strongly impressed with this claim; but when we consider the testimony to the effect that some logs were left in the woods, that some logs were lost in driving a difficult stream, and that the reports of the consignees, so far as they can be compared, show no discrepancy, and the evident inaccuracy of recollection as to the amount on hand at the time of the equalization, we are not convinced that there was any shortage in logs, but, on the contrary, are satisfied that the defendant has not been guilty of converting any of this timber.

3. Exception is also taken to the disallowance of credits to defendant for moneys paid out in the business of the firm. The defendant contends that the method of stating the account adopted by the commissioner was unjust, and resulted in excluding numerous items which should have been allowed. The commissioner states his reason for adopting the method to which resort was had, as follows:

"Checks are produced, which defendant testifies were in some instances for labor paid directly to the men, in other instances for supplies and the like paid to different parties, in other instances for time cards, and in other in-

stances for time cards and supplies. A large part of the accounting is made to rest upon this class of proof. Defendant's counsel admit that, while these checks show disbursements of money, they do not show the purpose. Whether it is a proper item to charge against the firm rests entirely upon defendant's assertion. I speak only of such bills as have not in some way been itemized. All the itemized bills I have allowed, a large portion of the same being admitted expressly by the complainant. Some of the parties of whom defendant bought supplies (Smith, Blankenhorn, and others) have been sworn, but their books were not produced, and their testimony fails to make the matter any clearer. The itemized bills contradict their verbal testimony, in many instances showing that what they said was paid entirely for supplies was in considerable part for time cards or labor. There is no means of determining from any proof in the case whether improper items are included, since there is nothing to show in detail for what the expenditures were made. I have critically examined this testimony, and it convinces me that it adds substantially nothing to Coach's, so that the matter stands, so far as unitemized bills are concerned, as he left it. In my judgment, this is not a proper way to account. It deliberately ignores the plain and acknowledged duty resting on the defendant to render as full an account as is in his power. It renders it impossible for complainant or the court to test the truth or accuracy of the account. There is no possible way of checking it up. It is not an accounting in any sense. * * * I have, for these reasons, refused to allow credit to defendant for alleged expenditures for supplies where the bills are not itemized, or for alleged payments on account of labor as shown by the checks. For the labor account, I have gone to the camp books, and have allowed what they showed was paid for labor, also what appears by Exhibit 95. I have refused credit for payments said to be for labor and camp supplies, rejecting any labor thus included because it appears in the camp book, and because the amount is not properly shown, and rejecting any supplies that may thus be included because they are not itemized or shown by proper proof."

The circuit judge adopted the same method of statement. An examination of the record convinces us that no injustice was done the defendant by adopting this

method, and that, by adopting any other, duplication was liable to occur.

Defendant's counsel used the account of J. B. Smith as an illustration. Defendant charged as paid to J. B. Smith for merchandise nearly $16,000. The commissioner disallowed $4,025, part because it was known to be included in other accounts, and part for the reason that it was not itemized so as to enable the commissioner to determine whether it was included or not. Defendant's counsel say of this method:

"On the basis adopted by the commissioner, the fact and amount of disbursements is a matter of assumption merely, and he utterly disregards the positive proof of the payment actually made by the defendant, as shown by the testimony, accounts, and vouchers. With regard to the particular matter under consideration (namely, the deduction from the Smith account of all items shown to have been paid for labor orders included in the account as submitted by Mr. Smith, and covered by payments represented by the vouchers for the credits on that account), the defendant may or may not have suffered. It is possible that in picking out the orders given by the employés of the concern to various parties, as shown on the camp books, the credit has been given. Perhaps too much may have been given. That we cannot ascertain. But, by reason of his method of stating his account, he has failed to credit the defendant with thousands of dollars to which he is entitled. His reason (among others) is that, by giving such credit, he may duplicate some items. He has created this reason by the method he has adopted. It does not exist in our method of stating the account, under which we ask credit for particular disbursements upon proof of the actual payment of the money."

Counsel overlook the fact that, in accounting, the *amount* paid is not enough to enable those dealing with the account to determine its accuracy and fairness. In addition, it must be known *for what* the money was paid. Nor ought complainant to be compelled to accept defendant's statement that the money was expended for the company, without full information as to what the money was expended for. The danger of stating an account in any

other way is well illustrated by the brief of defendant's counsel when they are dealing with another item of the account, known as the "Blankenhorn Account." This is a charge for money paid Blankenhorn, $1,248.84. Counsel conceded that, of this account, $41.12, charged in the account as "A. Gingras," should be deducted, for the reason that the same item is included in the vouchers produced by defendant for which he has taken credit. Except for this discovery, the defendant might have had a double credit, if the defendant's method were adopted by the commissioner. The method adopted entitles defendant to credit for all labor paid for by him, and for all merchandise consumed by the firm; but he is not entitled to charge in gross an amount of money paid for merchandise, which may include items which were furnished to the employés on orders. We find the same difficulty expressed by the commissioner in accepting the defendant's method of stating the account. Adopting the method pursued by the commissioner, we have not, after a careful examination of the various exceptions, found evidence justifying us in sustaining exceptions to the findings of the commissioner fixing the credit to be allowed defendant. It is possible that defendant may not have received full credit, but, if not, he is responsible for his loss.

4. Defendant also made a claim for allowance of his personal expenses, which was disallowed. There was no attempt to keep an account of his expenses, and, as it appears that during the time of the firm operations he was engaged in business on his own account, we think the item was properly disallowed.

With the exception of the charge for shortage in logs, the decree will be affirmed. Defendant will recover costs in this court, but will be limited in his taxation of costs for printing brief to 100 pages.

The other Justices concurred.